**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

v.   NO. 10-CR-3374 WJ

JUAN MANUEL FUENTES-ONTIVEROS,

       Defendant.

## MEMORANDUM OPINION AND ORDER OVERRULING DEFENDANT'S OBJECTION TO PRE-SENTENCING INVESTIGATION REPORT

THIS MATTER comes before the Court on Defendant's Objection to Pre-sentencing Investigation Report (**doc. 86**), filed January 16, 2012. Defendant Juan Manuel Fuentes-Ontiveros ("Defendant") objects to the two-level sentencing guideline enhancement in U.S.S.G. § 2D1.1(b)(12), applied by the probation officer in calculating the recommended sentencing guideline offense level in Defendant's Pre-sentence Report ("PSR"). Section 2D1.1(b)(12) calls for a two-level increase for maintaining a premises for the purpose of distributing a controlled substance. Defendant timely objected to this two level enhancement arguing that the enhancement does not apply based on the facts of this case. On April 9, 2012, the Court conducted an evidentiary hearing and after considering the undisputed factual contents of the PSR, the testimony of DEA Agent Reynaldo Rodriguez and the written and oral arguments of counsel, the Court overrules Defendant's objection and finds that the two-level enhancement of § 2D1.1(b)(12) applies to Defendant. Accordingly, Defendant's correctly calculated advisory guideline sentence is offense level 33, criminal history category I which establishes a guideline imprisonment range of 135 to 168 months.

## FACTUAL BACKGROUND

Defendant entered into a Plea Agreement with the United States (**doc. 62**) and pled guilty to the crime of conspiracy to distribute one kilogram and more of heroin. The facts supporting Defendant's guilty plea are not in dispute. What is disputed are the facts relating to whether Defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance" that would trigger the two level enhancement of § 2D1.1(b)12.

The heroin trafficking investigation of Defendant and others began in June of 2010. Defendant, who illegally entered the United States from Mexico, initially shared a residence at 936 West Sky SW in Albuquerque with his cousin, co-defendant Manuel Fuentes-Careno ("Fuentes-Careno"). Sometime around September of 2010, Fuentes-Careno asked his girlfriend Alma Alvarez to ascertain if the residence at 627 82nd St. SW was available to rent. Alvarez, along with Abigail Mares, helped Defendant and Fuentes-Careno rent the property at 627 82nd St. SW. Defendant's name does not appear on the rental agreement; instead, the names Alma Alvarez, Abigail Mares, and Manuel Hernandez (the last name believed to be an alias for Fuentes-Careno), appear as tenants on the rental agreement. Law enforcement surveillance determined that by October 14, 2010, Defendant and Fuentes-Careno were living in the residence at 627 82nd St. SW. The evidence that Defendant lived for some period of time at the 82nd St. address is ample. Most importantly, in the plea agreement Defendant admitted that he lived there for at least some time; secondly, Alma Alvarez told law enforcement that Defendant had moved there with Fuentes-Careno, and that they lived there together during the relevant period. Further evidence confirms Defendant's admission and Alvarez's statements: a hotel receipt with Defendant's name was found in a trash pull at the 82nd St. address, there was an assortment of men's clothing in the closets of two bedrooms there (confirming the fact that

Defendant and Fuentes-Careno both lived there), and Defendant was observed to be present at the address on multiple occasions by law enforcement personnel. Although a search of the premises revealed no additional items bearing Defendant's name, there was some evidence that an unrelated police search of heroin distributors may have provided Defendant with some warning, or at least inspired caution, immediately before the 82nd St. address was searched.

There was also significant evidence that drug-related activity was taking place at the house. Drugs were found in the vehicles parked in the garage, and drugs were also found in a common bathroom near the two occupied bedrooms. According to the investigation, drugs were being stored and also repackaged at the 82nd St. address. Most importantly, law enforcement personnel observed Defendant make a drug delivery from 82nd St. to the West Sky address. During an undercover drug buy, Jose Carmen Rivas-Aispuro (a co-Defendant) called Defendant and requested that Defendant bring drugs to West Sky; Defendant called when he left 82nd St., and then drove directly to the West Sky address, delivering the drugs to Aispuro. Defendant was also observed at different times driving each of the vehicles which the investigation showed were being used to deliver drugs.

## DISCUSSION

The government argues that Defendant is subject to the application of the two-level enhancement in § 2D1.1(b)(12), and thus the government has the burden of proving the necessary factual support by a preponderance of the evidence. See *U.S. v. Maestas*, 642 F.3d 1315, 1322 (10th Cir. 2011)). Section 2D1.1(b)(12) applies where a Defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." It was added to the Sentencing Guidelines Manual as a result of the Fair Sentencing Act of 2010, Pub. L. No. 111–220, 124 Stat. 2372. Application note 28 to § 2D1.1 provides guidance as to how this

particular enhancement is to be applied:

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

As to the first factor, the government has provided no evidence that Defendant had a formal possessory interest in the residence, and thus this factor weighs against applying the enhancement. As to the second factor, Defendant lived at the residence, and stored personal items in one of the bedrooms. Also, Defendant actively participated in the drug business being carried on at the 82nd St. address, and on at least one occasion was put in charge of answering phone orders for drugs, preparing those orders, and delivering illegal narcotics to West Sky. From these facts the Court finds that Defendant exercised at least some control over the premises, the drugs located at the premises, the vehicles in the garage at the premises, and the overall operations carried on at the 82nd St. address.

As to Defendant's purpose behind his use of the residence, the fact that large quantities of drugs were found both in the vehicles in the garage of the residence and in a common bathroom in the residence supports the conclusion that the distribution of drugs was a significant part of the activities at the house. The investigation revealed that drugs were being re-packaged and stored at the residence, and that drug deliveries were made by Defendant or co-Defendant Fuentes-Careno from the residence on multiple occasions. These facts show a pattern of drug

4

related activities at the 82nd St. address, militating a finding that drug-related activities were a significant part of Defendant's use of the residence, even if Defendant also made legal use of the residence.

The Court concludes, after consideration of the factors in the application note, that § 2D1.1(b)(12) applies to Defendant. Nevertheless, because one of the factors weighs against applying the enhancement, the Court finds it appropriate to briefly consider the relevant caselaw in order to ensure that the enhancement is proper.

The specific application of this enhancement has yet to be addressed in the Tenth Circuit; thus far the only case addressing it appears to be *United States v. Ortiz*, 2011 WL 3836527 (N.D. Ill. 2011). However, as the court notes in *Ortiz*, the Fair Sentencing Act linked this enhancement to 21 U.S.C. § 856, which makes unlawful "knowingly [to] open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1). Therefore, in addition to the application note, this Court will take guidance from Tenth Circuit caselaw analyzing the meaning of the word "maintain" as used in 21 U.S.C. § 856.

Under Tenth Circuit precedent, for a defendant to have "maintained" a place "where the 'place' in question is a residence, the defendant must have a 'substantial connection' to the home and must be more than a 'casual visitor.'" *U.S. v. Verners*, 53 F.3d 291, 295–96 (10th Cir. 1995) (citing *United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990)). As the *Verners* court noted, "[w]here the defendant lives in the house, this element is normally easily proved." *Id.* (citing *United States v. Onick*, 889 F.2d 1425, 1431 (5th Cir. 1989)). The court went on to conclude that a defendant who lived in his parents house, having no ownership interest or rent obligations, exercised control over the residence and particularly his room because he "had lived

there and continued to use the bedroom to store many of his personal belongings and business-related items. He had a key to the house and came and went as he pleased. He was far from a casual visitor." *Id.*; *see also U.S. v. Wood*, 57 F.3d 913, 919 (10th Cir. 1995).

The *Verner*s court cited the earlier Fifth Circuit case, *U.S. v. Onick*, 889 F.2d 1425 (5th Cir. 1989), with approval. In that case, the court wrote:

> A reasonable jury could find that Tolliver knowingly maintained a place to manufacture, distribute, or use drugs. Beginning with the premise that Tolliver lived in the house, the jury first could infer that Tolliver came across and therefore knew about the drugs and drug paraphernalia scattered throughout the house. Second, the jury could infer that Tolliver maintained the house because he lived there. Third, based on the large quantity of drug paraphernalia used to measure and package drugs (particularly the 4,063 gelcaps), the jury could infer that Tolliver intended to use the property to distribute drugs. Therefore, a reasonable jury could convict Tolliver for knowingly maintaining a place to manufacture, distribute, or use drugs.

*Id.* at 1430.

Like the defendants in both *Verners* and *Onick*, Defendant Fuentes-Ontiveros, though he did not have a possessory interest, lived at 627 82nd St. SW., stored his personal property in one of the bedrooms, came and went freely, and participated actively in the drug operations there. Thus the evidence, both direct and circumstantial, establishes that Defendant was more than a casual visitor to 82nd St., but instead resided there and distributed drugs there.

Defendant places great importance upon the fact that his name did not appear on any of the documents regarding the house, including the rental agreement and the utilities. However, in this case, the two residents of the 82nd St. address were illegal immigrants actively engaging in the illegal distribution and trafficking of heroin. Therefore they had a significant incentive to

minimize the degree to which their names appear on any documents.[1]  Fuentes-Careno used an alias, and Defendant kept his name off any documents.  The Court, however, sees no reason to turn this one factor into a dispositive requirement, especially in a situation where doing so would provide an unmerited windfall to a Defendant who was fortunate enough to have convinced someone else to procure a rental property for his residence.

## CONCLUSION

Accordingly, the Court concludes, after a consideration of the application notes and the relevant caselaw, that the proof offered by the government that Defendant lived at the residence, freely coming and going and keeping personal items in a bedroom, and that Defendant participated to a significant degree in the drug activities there, exercising some degree of control over those activities, establishes by a preponderance of the evidence that Defendant was maintaining a premises for the purpose of distributing heroin.  Therefore the two-level enhancement in guideline § 2D1.1(b)(12) applies to Defendant.  Probation correctly calculated Defendant's sentencing guidelines offense level at 33.

**SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE

---

[1]The Court notes that persons engaged in the distribution of illegal narcotics typically try to remain undetected and below the radar screen regardless of their immigration status.